IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GREGORY MARSHALL #183459
Plaintiff :

v. : CIVIL ACTION NO. JFM-08-3269

DR. ISAIAS TESSEMA, MD :
DR. MICHAEL SUMMERFIELD, MD
DR. EMMA OFFAHO, OD :
NURSE HETTY CHARLENE TRENUM, RN :
PRISON OPTOMETRIC SERVICES
SANTANA NOTTAGE :
WEXFORD HEALTH SOURCE, INC.
Defendants :

**MEMORANDUM**

Americans with health problems often struggle to coordinate their care and treatment among a plethora of specialists, juggling scheduling, referrals and reports to insure their medical needs are met. Coordination of health care for those housed in prisons certainly is no less problematic and brings into play a myriad of additional challenges ranging from frequent transfers of prisoners between institutions to resource management practices which include awarding different segments of health care delivery to separate medical corporations under contract with federal, state or local governments.

These challenges clearly impact the instant case. On December 2, 2008, Gregory Marshall, incarcerated within Maryland's Division of Correction (DOC) and currently housed at the Western Correctional Institution (WCI), filed a prisoner civil rights action seeking to obtain prescribed rigid gas permeable contact lenses (RGPCL). For many years, Marshall has suffered from keratoconus, a degenerative eye disease wherein the cornea becomes cone-shaped, causing

visual distortion.[1] Health care providers under contract with the DOC have prescribed RGPCL and provided him replacement lenses for many years.[2] The parties do not dispute that Marshall needs the lenses to lessen the visual distortion caused by his disease, nor do they dispute that he last received a new pair of RGPCL on June 20, 2007, while incarcerated at the Eastern Correctional Institution (ECI). Document 4-2, ¶ 3.

On January 3 and 6, 2008, Marshall complained that his eyes hurt and he needed contact lenses.[3] *Id*., ¶ 4. On January 16, 2008, defendant Hetty Charlene Trenum, RN, a Correctional Medical Services (CMS) employee, tested Marshall's vision, found it to be 20/200 in each eye,[4] noted his complaints of seeing double and having blurred vision, and referred him to the eye clinic.[5] On February 12, 2008, defendant Isaias Tessema, MD, also a CMS employee, ordered an on-site ophthalmology consultation to follow up regarding Marshall's keratoconus. *Id*., ¶ 5.

On April 12, 2008, Dr. Michael Summerfield, MD, an ophthalmologist with Summerfield

---

[1] Marshall is no stranger to this court, having filed dozens of lawsuits during his past two decades of incarceration. In addition to his eye condition, Marshall, who is in his 40s, is known for self-injurious behavior and past refusals to comply with treatment and medication regimens with regard to his mental health diagnoses, which include malingering, borderline personality disorder, depressive disorder and antisocial personality disorder. His mental illness has led to multiple transfers among DOC facilities over the years. *See Marshall v. Warden,* Civil Action No. 08-221, Paper No. 7, Exhibit 2 at 2-4; s*ee also Masrshall v. Lynn, et al*., Civil Action No. JFM-07-2711, July 26, 2007, admission summary.

[2] The rigid lens material in RGPCL "vault over" the cornea and replace the cornea's irregular shape with a smooth, uniform refracting surface, thus improving vision. A pair of RGPCL can last several years, as long as the wearer does not require a prescription change. Document 4 at 2, n.4.

[3] It appears that Marshall lost the lenses received in June of 2007 sometime between his release from Suicide Housing Observartion at ECI in September of 2007 and his transfer to WCI in January of 2008. Document 1 at 6-7. His first documented complaint to WCI personnel concerning the missing lenses occurred on January 3, 2008. The court accepts this date as that on which Marshall's need for replacement RGPCL became known to WCI health care providers.

[4] Normal visual acuity is 20/20. Document 4 at 4, n. 5.

[5] The January 16, 2008 examination and referral appears to be the only contact between Marshall and Trenum with regard to the eye claim at issue here. Clearly there is no suggestion that Trenum's contact with Marshall violated his Eighth Amendment rights. If Trenum in fact called Marshall a "scary [sic] cat," such remark does not amount to a violation of constitutional dimension.

Eye Associates, LLC, examined Marshall, who told him the RGPCLs had been confiscated.[6] Document 14-2 at 1. Summerfield called the Wilmer Eye Clinic[7] to obtain the prescription for the lenses and forwarded the prescription to Santana Nottage, President of Prison Optometric Services (POS), so that POS could order the lenses. Nottage claims, however, that DPSCS employee Olivia Ryan,[8] not POS, was responsible for ordering the lenses.

POS employee Emma Offaho, OD met with Marshall on June 11, 2008, to fit his lenses, but learned at that time that the lenses had not yet been dispensed. Defendant Offaho noted that she would contact Dr. Summerfield to check on the status of the order. Document 4-2 at 5 and Document 4, Exhibit C at 21-22.

On August 21, 2008, Dr. Summerfield again examined Marshall and learned the prescription for the lenses had yet to be acted upon. He sent an email that day to Nottage and Ryan and also forwarded the prescription. Document 14-2 at 3 and Document 62-3. The prescription, however, had expired, and could not be filled by Wilmer. Document 62-2. While processing of a new prescription was underway, a POS optometrist on August 27, 2008, examined Marshall for a pair of eye glasses which were provided on September 23, 2008.[9] Plaintiff refused to wear the eye glasses which, as noted by Dr. Offaho following her examination on November 5, 2008, provided no improvement in his vision. Document 4-2 at 6. Marshall voiced one complaint about non-delivery of the lenses on November 14, 2008 (Document 4, Exhibit C at 37), and filed this action a few weeks later.

[6] Nothing in the record suggests the lenses were confiscated by corrections personnel as opposed to lost by corrections personnel during Marshall's transfers or otherwise lost, damaged or misplaced by Marshall himself.

[7] Wilmer is a department within the Johns Hopkins Hospital system.

[8] Olivia Ryan is not a party to this case.

[9] There is no dispute that eye glasses do not provide Marshall the visual acuity he obtains through use of RGPCLs, and that they were provided as a stop-gap accommodation to help Marshall until the lenses were obtained.

It appears the lenses were delivered to WCI on April 2, 2009. Document 62-2 at 2. After five attempts were made over a period of several months to fit the lenses,[10] POS employees in July of 2009 notified DPSCS employees Olivia Ryan, Nicole Symon and Victor Jackson that their company could not assist Marshall and he should be referred to an ophthalmologist. Document 62-7. There is no indication as to what care, if any, has been provided Marshall in the months after that correspondence.

Against this background, the undersigned now examines the parties' motions and responses. Plaintiff has filed repeated requests for immediate injunctive relief against a number of individuals and corporations. While he is clearly entitled to injunctive relief (a pair of properly-fitting prescription RGPCL),[11] the question as to who is required to provide such relief remains unsettled and, for that reason, his numerous motions requesting emergency relief must at this juncture be denied. As the Supreme Court has stated:

> "As a preliminary injunction affords an extraordinary remedy prior to trial relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate: (1) by a "clear showing" that, he is likely to suceed on the merits at trial; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest."

*See Winter v. Natural Resources Defense Council, Inc*., --- U.S. ---, 129 S.Ct. 365, 374-376 (2008).[12] It is unclear whether Marshall is "likely to suffer irreparable harm" if some additional delay in obtaining the lenses occurs and, absent a determination of the appropriate defendants,

[10] Although not spelled out in the email messages, it appears that by the time the lenses reached Marshall, the condition and shape of his cornea may have changed, leaving him unable to wear the lenses prescribed.

[11] Marshall is not entitled to transfer to the prison of his choice, nor necessarily to the "outside" health care provider he prefers.

[12] The previous Fourth Circuit balance-of-hardship test set out in *Blackwelder Furniture Co. v. Seilig Manufacturing Co*., 550 F.2d 189 (4th Cir. 1997) is no longer to be applied when granting or denying preliminary injunctions, as the standard articulated in *Winter* governs the issuance of such emergency relief. *See Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F. 3d 342 (4th Cir. 2009).

the court cannot compel a health care provider to act. With the exception of the injunctive relief request contained in the complaint, the remainder of plaintiff's injunctive relief requests shall be denied.[13]

This brings to the fore the question of who is responsible for obtaining and fitting Marshall's lenses. Nurse Trenum and Dr. Tessema, employees of Correctional Medical Services, Inc. (CMS), were not under contract to provide eye care to DOC prisoners; instead, optometry and ophthalmology services within the DOC are awarded to various contractors by agreement with Wexford Health Sources, Inc. (Wexford), Maryland's utilization review contractor.[14] Wexford has awarded optometry services[15] to Prison Optometric Services, Inc. (POS). Wexford negotiated provider agreements for ophthalmology services[16] with Dr. Michael Summerfield and Summerfield Eye Associates, LLC, beginning in July of 2007, to provide on-site ophthalmology services for DOC prisoners.

To prevail on a civil rights claim alleging an Eighth Amendment violation of the right to

[13] Marshall's request for recusal (Document 71) shall be denied as he fails to allege with specificity any personal bias or prejudice either against him or in favor of defendants. *See* 28 U.S.C. §144; *see also Sine v. Local No. 992 International Brotherhood of Teamsters*, 882 F. 2d 913, 914 4th Cir. (1989). To be considered legally sufficient a party seeking recusal must provide an affidavit alleging personal bias or prejudice cause by an extrajudicial source other than what the judge has learned or experienced from his participation in the case. *See United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *Sine*, 882 F. 2d at 914. Marshall provides no factual basis to question the impartiality of this court.. *See* 28 U.S.C. § 455; *see also In re Beard*, 811 F.2d 818 (4th Cir. 1987). As such, the pleading is legally insufficient to warrant the relief requested and shall be denied. Marshall's requests to compel action on this case (Documents 65, 68, 70 and 75) are moot.

[14]Additionally, Wexford on behalf of the Maryland Department of Public Safety and Correctional Services (DPSCS) negotiates and signs contracts with hospitals, specialists and other medical service providers for inclusion in Wexford's provider network for prison healthcare services. Document 8-2. If a prisoner requires care that cannot be provided on-site, the provider is to request from Wexford a referral to an off-site provider. *Id*., Document 8-3 and 8-4.

[15] These services, provided by doctors of optometry or ODs,include examination of the eyes to diagnose vision problems such as nearsightedness or farsightedness and test patients' depth and color perception and ability to focus and coordinate eye movement. *See* Document 62 at 1, n. 2.

[16] These services are provided by medical doctors who have specialized in diseases and surgery of the visual pathways, including the eye. Document 62 at 1., n. 2.

medical care, Marshall must first satisfy the "objective" component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). This he has done. He must also prove the second subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of prison officials or health care personnel to his serious medical need. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06).

Counsel for CMS, Wexford, POS and Summerfield Eye Associates have filed show cause responses but have not formally accepted service on behalf of their clients and their employees. Nonetheless, the parties' submissions demonstrate that CMS (and its employees Tessema and Trenum) and POS (and its officer Nottage and employee Offaho) cannot provide the necessary lenses to Marshall. CMS is not contractually required to treat prisoners' ophthalmic conditions, and POS lacks the advanced skills needed to properly fit Marshall with RGPCL. Their responses are sufficient to mandate their dismissal from this case at this time.

Gregory Marshall has been without medically necessary rigid gas permeable contact lenses for nearly one year. To date, the confusion among health care providers as to who is providing the lenses does not appear to be the result of deliberate indifference sufficient to constitute a violation under the Eighth Amendment. That confusion, however, is now resolved. By its own admission Wexford, on behalf of the DPSCS, has contracted with Summerfield Eye Associates to provide ophthalmology services to Maryland's prisoners. Summerfield is contractually empowered to request referrals to other providers from Wexford, and Wexford must procure such services through the use of additional outside vendors if needed. Counsel for

Wexford and Summerfield shall provide a status report or other appropriate motion setting forth: when Marshall's vision will be checked so that a proper prescription can be updated; who shall order the lenses and transmit the prescription; who will follow up to ensure the lenses are made and delivered to the prison; and who shall present the lenses to Marshall, ensure they fit, and provide him any appropriate instruction as to their care. Counsel for Wexford and Summerfield shall also notify the court as to whether counsel is authorized to accept service of process on behalf of their clients and, if such authorization is not provided, shall provide the court with information concerning registered agents or other parties authorized to accept same.

A separate order shall be entered herewith.

__November 5, 2009
(Date)

__/s/__________________________
J. Frederick Motz
United States District Judge